

2008 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

8-4-2008

# DeJohn v. Temple Univ

Precedential or Non-Precedential: Precedential

Docket No. 07-2220

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2008

Recommended Citation

"DeJohn v. Temple Univ" (2008). *2008 Decisions.* Paper 605.
http://digitalcommons.law.villanova.edu/thirdcircuit_2008/605

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2008 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

Case No: 07-2220

CHRISTIAN M. DEJOHN
v.

TEMPLE UNIVERSITY; DAVID ADAMANY,
President of Temple University,
in his individual and official capacity;
RICHARD IMMERMAN, in his individual and
official capacity; GREGORY J.W. URWIN,
in his individual and official capacity,

Appellants

---

On appeal from the United States District Court
for the Eastern District of Pennsylvania
District Court No. 06-CV-778
District Judge: The Honorable Stewart Dalzell

---

Argued April 10, 2008

Before: SMITH, HARDIMAN, and ROTH,
*Circuit Judges*.

(Filed: August 4, 2008)

Leonard G. Brown, III, Esq.
Clymer & Musser
408 West Chestnut Street
Lancaster, PA 17608

Benjamin W. Bull, Esq.
Alliance Defense Fund
15100 North 90th Street
Scottsdale, AZ 85260

David A. French, Esq.
Alliance Defense Fund
12 Public Square
Columbia, TN 38401

David J. Hacker, Esq.
Alliance Defense Fund
101 Parkshore Drive
Suite 100
Folsom, CA 95630

Nathan W. Kellum, Esq. (Argued)
Alliance Defense Fund
699 Oakleaf Office Lane
#107
Memphis, TN 38117

*Counsel for Appellee*

Joe H. Tucker, Jr., Esq. (Argued)
Booth & Tucker
1617 John F. Kennedy Boulevard
Suite 1700
Philadelphia, PA 19103
    *Counsel for Appellant*

## OPINION

SMITH, *Circuit Judge*.

Christian DeJohn sued Temple University, its former president, David Adamany, and two of his former graduate school professors, Richard H. Immerman and Gregory J.W. Urwin (hereinafter collectively referred to as "Temple" or "the University") in an eight-count complaint for violations of, *inter alia*, First Amendment freedom of speech and expression stemming from the University's Policy on Sexual Harassment.[1] In an Order dated March 21, 2007, the District Court granted DeJohn's motion for partial summary judgment in the form of injunctive relief ("March 21 Order"). At that time, the Court reserved the issue of damages for trial, explaining that "[b]ecause the question of what, if any, harm DeJohn suffered

---

[1]   DeJohn's first through sixth causes of action alleged that Temple violated his First and Fourteenth Amendment rights to free expression, due process, equal protection of the law, and Pennsylvania tort and contract law. DeJohn's seventh and eighth causes of action were brought under 42 U.S.C. § 1983, alleging violations of his rights to freedom of expression and due process of law and his First Amendment right to freedom of expression. Only these final two counts are at issue in this appeal. We address them together as they both were briefed and argued as facial challenges to the University's sexual harassment policy.

3

as a result of the unconstitutional policy is a question of fact about which there are serious disputes, it must be held over for trial." On April 20, 2007, Temple timely appealed to this Court from the March 21 Order. The case went to trial, and on April 26, 2007, the District Court entered Final Judgment in favor of DeJohn on counts seven and eight of his Complaint, permanently enjoining Temple from reimplementing or enforcing its previous sexual harassment policy,[2] and awarding $1.00 in nominal damages in favor of DeJohn and against Temple University. Temple did not appeal from the Final Judgment. Because we conclude that the District Court's March 21 Order was a non-final order under 28 U.S.C. § 1291, we exercise appellate jurisdiction pursuant to 28 U.S.C. § 1292(a)(1) over only that portion of the order granting injunctive relief. However, we lack jurisdiction over the Final Judgment and award of damages in DeJohn's favor. In addition, because we conclude that the issue of whether Temple University's Policy on Sexual Harassment is constitutional is not moot, and because we conclude on the merits that the policy is facially unconstitutional, we will affirm the District Court's grant of injunctive relief.

I.

Christian DeJohn served in the Pennsylvania Army National Guard. In January 2002, he enrolled in Temple University to pursue a master's degree in Military and American

---

[2] As we discuss below, Temple University modified its Policy on Sexual Harassment during the course of this litigation. This appeal deals only with the constitutionality of the Policy prior to its modification.

4

History. To obtain a master's degree in history at Temple, a student must first successfully complete his course work. The student then has the option of either taking a comprehensive exam or completing a master's thesis. The parties agree that all course work and other requirements must be completed within three years from the date of admission unless a leave of absence has been granted. A graduate student in the history department must form a thesis committee, which includes an advisor selected by the student to serve as the primary reader of the master's thesis and a secondary reader also chosen by the student. The thesis must be acceptable to both readers before the graduate student is allowed to defend it.

DeJohn took four classes in his first semester as a graduate student. Following that semester, DeJohn was called to active military duty and was deployed to Bosnia. He earned graduate level credit while deployed through a correspondence course related to the Vietnam War. By the end of the following fall 2003 semester, DeJohn had completed all of the required course work for his advanced degree. In January 2004, he chose to draft a master's thesis in lieu of taking a comprehensive examination, and Dr. Jay Lockenour, a tenured associate professor of history, agreed to serve as his thesis advisor. Dr. Lockenour received DeJohn's completed draft of his thesis on March 16, 2005. By March 27, 2005, Dr. Lockenour had read the entire thesis and e-mailed DeJohn with further, specific critiques. DeJohn met with Dr. Lockenour on April 18, 2005, to discuss necessary revisions, and the revisions continued. On July 21, 2005, Dr. Lockenour approached Dr. Gregory J. W. Urwin, a professor of history, at DeJohn's request and asked him to serve as DeJohn's secondary reader; Dr. Urwin agreed. On August 20, 2005, DeJohn delivered a revised draft of his

thesis to Dr. Urwin, who reviewed it. In March 2006, DeJohn produced his most recent thesis draft to Dr. Andrew Isenberg, the Chair of the History Department. Dr. Isenberg forwarded the draft to Dr. Lockenour for his review as DeJohn's primary reader. The record indicates that DeJohn is not currently registered as a student at Temple and has not been registered since the 2006 spring semester.

DeJohn filed the instant action on February 22, 2006. Only two of the original counts are at issue in this appeal. These remaining counts embody DeJohn's challenge of Temple University's Student Code of Conduct and related polices, in particular as they address sexual harassment. The Temple policy challenged here reads, in relevant part:

> all forms of sexual harassment are prohibited, including . . . expressive, visual, or physical conduct of a sexual or gender-motivated nature, when . . . (c) such conduct has the purpose or effect of unreasonably interfering with an individual's work, educational performance, or status; or (d) such conduct has the purpose or effect of creating an intimidating, hostile, or offensive environment.

DeJohn claims that this policy is facially overbroad. Specifically, because of the sexual harassment policy, he felt inhibited in expressing his opinions in class concerning women in combat and women in the military. As a history graduate student, DeJohn found himself engaged in conversations and class discussions regarding issues he believed were implicated by the policy. That, in turn, caused him to be concerned that discussing his social, cultural, political, and/or religious views

6

regarding these issues might be sanctionable by the University. Thus, DeJohn contends that the policy had a chilling effect on his ability to exercise his constitutionally protected rights.

On May 22, 2006, Temple filed a motion to dismiss DeJohn's Complaint. On September 11, 2006, the District Court granted in part Temple's motion to dismiss with respect to counts three through six. The Court ordered Temple to file an Answer to the remaining counts. On October 9, 2006, DeJohn moved for a judgment on the pleadings on his seventh and eighth causes of action. The Court denied the motion, giving Temple an opportunity to support its sexual harassment policy by showing it had a particularized reason to anticipate "substantial disruption from the broad swath of student speech prohibited under the Policy."

On January 15, 2007, less than three weeks before the deadline for filing dispositive motions in the case, Temple modified its sexual harassment policy. Temple then filed a motion for a protective order and a motion to quash *duces tecum*—arguing that because there were no longer issues in the case due to the policy modification, DeJohn was not entitled to a Rule 30(b)(6) deposition on the sexual harassment policy or *duces tecum* discovery of records of past harassment complaints. The District Court denied this motion, concluding in part that there was nothing to prevent Temple from restoring the policy as soon as counts seven and eight of the Complaint were resolved.

After discovery, DeJohn moved for summary judgment on counts seven and eight and Temple moved for summary judgment on all remaining claims. On March 21, 2007, the

7

District Court granted DeJohn's motion, declared the Temple University Policy on Sexual Harassment (as enacted before January 15, 2007) facially unconstitutional and enjoined Temple from reimplementing or enforcing the sexual harassment policy that existed before the changes implemented on January 15, 2007. The District Court granted in part and denied in part Temple's motion for summary judgment on the remaining claims in the case. Temple appealed the partial grant of summary judgment.

After trial, the District Court entered Final Judgment in favor of DeJohn on counts seven and eight, permanently enjoined Temple from reimplementing or enforcing its previous policy, and awarded $1.00 in nominal damages in favor of DeJohn and against Temple University. The Court entered judgment in Temple's favor as to counts one and two.

II.

Before we address the merits of Temple's appeal, we must determine the scope of our jurisdiction. Temple argues that we have jurisdiction over the District Court's grant of an injunction, as well as the District Court's award of damages. Temple argues that while the District Court did not award damages to DeJohn until April 26, 2007, its act of awarding damages was "purely ministerial or mechanical," and as such, the March 21 Order was a final order disposing of all of the claims. We cannot agree.

Temple argues that the March 21 Order ended the litigation related to counts seven and eight on the merits and left nothing else for the District Court to do but execute the

judgment. That is, Temple argues that this Court has appellate jurisdiction over this appeal pursuant to 28 U.S.C. § 1291. Federal Rule of Civil Procedure 54(b) directs otherwise. It provides that:

> When an action presents more than one claim for relief—whether as a claim, counterclaim, crossclaim, or third-party claim—or when multiple parties are involved, the court may direct entry of a final judgment as to one or more, but fewer than all, claims or parties only if the court expressly determines that there is no just reason for delay. *Otherwise, any order or other decision, however designated, that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties does not end the action as to any of the claims or parties and may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities.*

FED. R. CIV. P. 54(b) (emphasis added). The March 21 Order left a First Amendment retaliation claim and a § 1983 claim for money damages unresolved, and as such, the order was not final within the meaning of Rule 54(b). Rule 54(b) "expressly provides that an order adjudicating less than all claims in an action with multiple claims is not final unless the district court makes an express determination that there is no just reason for delay . . . on express direction for the entry of judgment." *Ortiz v. Eichler*, 794 F.2d 889, 891 (3d Cir. 1986) (internal quotation marks omitted). A district court may direct the entry of a final judgment pursuant to Rule 54(b) only when a distinct claim is fully adjudicated. Neither party suggests that Temple University moved for certification pursuant to Rule 54(b) on

9

counts seven and eight of the Complaint. Even had it done so, those counts had not been fully adjudicated as of March 21 because DeJohn's request for damages had yet to be determined. The quantification of damages, contrary to the University's argument, was more than a ministerial act to be performed by the clerk of the court and routinely executed by the judge. Indeed, it was a contested issue held for trial that required adjudication by a finder of fact and was not resolved by the March 21 Order. We have previously recognized that, "[i]t is a well-established rule of appellate jurisdiction . . . that where liability has been decided but the extent of damage remains undetermined, there is no final order." *Apex Fountain Sales, Inc. v. Kleinfeld*, 27 F.3d 931, 934–35 (3d Cir. 1994) (quoting *Sun Shipbuilding & Dry Dock Co. v. Benefits Review Bd.*, 535 F.2d 758, 760 (3d Cir. 1976) (per curiam) (collecting cases). *See also, e.g.*, *Republic Natural Gas Co. v. Oklahoma*, 334 U.S. 62, 68 (1948) ("[T]he requirement of finality has not been met merely because the major issues in a case have been decided and only a few loose ends remain to be tied up—for example, where liability has been determined and all that needs to be adjudicated is the amount of damages."); *Cohen v. Bd. of Tr. of the Univ. of Med. & Dentistry of N.J.*, 867 F.2d 1455, 1465 n.8 (3d Cir. 1989) (en banc) (explaining that the plaintiff's claim had not been fully adjudicated because her request for damages had not been determined); *EEOC v. Del. Dep't of Health & Soc. Servs.*, 865 F.2d 1408, 1413 (3d Cir. 1989) ("An order which establishes liability without fixing the amount of recovery is generally not final."); *Weiss v. York Hosp.*, 745 F.2d 786, 802 (3d Cir. 1984) ("because . . . additional proceedings, including the determination of certain defenses and of damages, are yet to take place, most of these 'judgments' . . . are not final within the meaning of 28 U.S.C. § 1291"), *cert. denied*, 470

10

U.S. 1060 (1985); *In re Jack Raley*, 17 F.3d 291 (9th Cir. 1995) (holding that the premature notice of appeal was not valid because the matter of prejudgment interest was not decided until long after the notice of appeal had been filed). Thus, the March 21 Order, though appealable under § 1292(a)(1), is not appealable under 28 U.S.C. § 1291.[3]

---

[3] In some circumstances, Rule 4(a)(2) of the Federal Rules of Appellate Procedure ensures that premature notices of appeal will remain effective to appeal a final judgment of the district court. The Rule provides that "a notice of appeal filed after the court announces a decision or order—but before the entry of the judgment or order—is treated as filed on the date of and after the entry." FED. R. APP. P. 4(a)(2). Accordingly, regardless of when the appeal was actually filed, a premature notice of appeal will relate forward to the date that the judgment or order is ultimately entered. *First Tier Mortgage Co. v. Investors Mortgage Ins.*, 498 U.S. 269, 275 (1991). Rule 4(a)(2) does not, however, preserve the effectiveness of every premature notice of appeal. A party who files a premature notice of appeal concerning a decision that was not immediately appealable at the time of the district court's announcement may lose the opportunity to appeal that decision. Rule 4(a)(2) permits a notice of appeal from a nonfinal decision to operate as a notice of appeal from the final judgment only when a district court announces a decision that *would be* appealable if immediately followed by the entry of judgment. *First Tier Mortgage Co.*, 498 U.S. at 276.

In a multiple claims action, an order/judgment disposing of less than all of the claims is not literally a decision that would be appealable if immediately followed by the entry of judgment because Rule 54(b) certification would have had to take place first. As previously stated, however, neither party suggests that Temple University moved for certification pursuant to 54(b);

11

Appeal is available as a matter of right from interlocutory orders with respect to injunctions. 28 U.S.C. § 1292(a)(1). Rule 54(b) does not limit appeals under § 1292(a)(1), even as to orders granting permanent injunctions. 16 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 3921.1 (2d ed. 1996).[4] Thus, Temple's Notice of Appeal is timely only to the extent that it appeals from the District Court's March 21 Order granting DeJohn's requests for injunctive relief on counts seven and eight of his Complaint.

and importantly, even if the University had, the issue of damages still remained. *See Cohen*, 867 F.2d at 1465 n.8 (explaining that the plaintiff's claims had not been fully adjudicated because her request for damages had not been determined); *see also In re Jack Raley*, 17 F.3d 291 (9th Cir. 1995) (holding that the premature notice of appeal was not valid because the matter of prejudgment interest was not decided until long after the notice of appeal had been filed). Thus, even if 54(b) certification were appropriate, it would not have converted the judgment into a wholly appealable one without modifying or enlarging that decision in any way. Thus, Rule 4(a)(2) provides no assistance to Temple University.

[4] Section 1292(a)(1) does not distinguish between preliminary and permanent injunctions and permanent injunctions are consistently appealed under § 1292(a)(1). *See Cohen*, 867 F.2d at 1464 n.7 ("Because section 1292 covers all injunctive orders, determining whether this order is a preliminary injunction or a permanent injunction is not relevant to our inquiry. The order is in either event interlocutory."). Thus, even though the District Court did not use the language of "preliminary" or "permanent" in its March 21 Order, either characterization would not affect our analysis here.

12

III.

Temple University argues that the District Court lacked jurisdiction to declare its former sexual harassment policy unconstitutional and to issue an injunction relating to that policy because 1) the constitutionality of the former policy was rendered moot after Temple voluntarily revised the policy on January 15, 2007, and/or 2) DeJohn left the University. We have explained that:

> The Constitution limits this court's jurisdiction to the adjudication of actual cases and controversies. "[A] case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." The court's ability to grant effective relief lies at the heart of the mootness doctrine. That is, "[i]f developments occur during the course of adjudication that eliminate a plaintiff's personal stake in the outcome of a suit or prevent a court from being able to grant the requested relief, the case must be dismissed as moot."

*Donovan ex rel. Donovan v. Punxsutawney Area Sch. Bd.*, 336 F.3d 211, 216 (3d Cir. 2003) (citations omitted).

We will first examine Temple's argument that DeJohn's claims for equitable relief in counts seven and eight became moot with the school's voluntary amendment of the contested policy. In doing so, we heed the Supreme Court's instruction that

13

as a general rule, "voluntary cessation of allegedly illegal conduct does not deprive the tribunal of power to hear and determine the case, i.e., does not make the case moot." But jurisdiction, properly acquired, may abate if the case becomes moot because (1) it can be said with assurance that "there is no reasonable expectation . . ." that the alleged violation will recur, and (2) interim relief or events have completely and irrevocably eradicated the effects of the alleged violation. When both conditions are satisfied it may be said that the case is moot because neither party has a legally cognizable interest in the final determination of the underlying questions of fact and law.

*Los Angeles County v. Davis*, 440 U.S. 625, 631 (1979) (internal citations omitted). The Supreme Court noted that, "[t]he burden of demonstrating mootness 'is a heavy one.'" *Id.* (citation omitted). Our Court has articulated the burden for the party alleging mootness as "'heavy,' even 'formidable.'" *United States v. Gov't of Virgin Islands*, 363 F.3d 276, 285 (3d Cir. 2004). We conclude that Temple has not met this burden.

Given the posture of this case, and the briefing on appeal, we are left with no assurance that Temple will not reimplement its pre-January 15 sexual harassment policy, absent an injunction, after this litigation has concluded. *See Davis*, 440 U.S. at 631 (holding that only if there is no reasonable expectation that the alleged violation will recur can the voluntary cessation of a challenged practice render a case moot). Temple did not change its sexual harassment policy for more than a year after the commencement of litigation and then only near the end of discovery, less than three weeks before the

14

dispositive motions deadline in the case. More importantly, Temple defended and continues to defend not only the constitutionality of its prior sexual harassment policy, but also the need for the former policy. We consider these two factors significant in evaluating whether there is a "reasonable expectation" that Temple will reimplement its previous sexual harassment policy. *See id.*

The Supreme Court considered mootness and the voluntary cessation of a policy in *Parents Involved in Community Schools v. Seattle School District No. 1*, 127 S.Ct. 2738, 2751 (2007). There, the Supreme Court considered whether a student assignment plan that relied on racial classification to allocate slots in oversubscribed high schools was constitutional. *Parents Involved in Cmty Schs.*, 127 S.Ct. at 2749. The plaintiff's son, Joshua, was assigned to Young Elementary, a school approximately ten miles away from their house. The mother attempted to have him transferred to a school one-mile away that had openings. Her request was denied because, "[t]he transfer would have an adverse effect on desegregation compliance" of Young. The mother then brought suit, alleging violations of the Equal Protection Clause. In challenging the petitioner's standing, the School District noted that it had ceased using the racial tiebreaker pending the outcome of the litigation. *Id.* at 2751. The Court noted that, despite this suspension, the School District vigorously defended the constitutionality of its race-based program, and did not deny that if the litigation was resolved in its favor it would resume using race to assign students. *Id.* The Court reiterated that, "[v]oluntary cessation does not moot a case or controversy unless 'subsequent events ma[ke] it absolutely clear that the allegedly wrongful behavior could not reasonably be expected

15

to recur,'" and the Court concluded that it was "a heavy burden that [the school district] has clearly not met." *Id.* We recognize that Temple never stated that it only changed its policy pending the outcome of this litigation, as occurred in *Parents Involved in Community Schools*. Nevertheless, Temple defended and continues to defend not only the constitutionality of its prior sexual harassment policy, but also the *need* for the former policy. Thus, like *Parents Involved in Community Schools*, there have been no subsequent events that make it absolutely clear that Temple will not reinstate the allegedly wrongful policy in the absence of the injunction. *See Davis*, 440 U.S. at 631; *see also Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.*, 528 U.S. 167, 189 (2000) (holding that the standard for "determining whether a case has been mooted by the defendant's voluntary conduct is stringent: A case might become moot if subsequent events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur.").

We came to a similar conclusion in *United States v. Government of Virgin Islands*, 363 F.3d 276 (3d Cir. 2004). There, the United States brought a Clean Water Act enforcement action against the U.S. Virgin Islands. 363 F.3d at 279. The Virgin Islands then entered into a negotiated contract with Global Resources Management ("GRM"), a company that was to provide the services necessary to achieve compliance. *Id.* The United States filed a motion to show cause as to why performance of the GRM contract should not be enjoined because it was likely tainted by political corruption, and that GRM itself was a start-up company with no equipment, assets, or experience in construction. *Id.* The District Court entered an order in March 2003 enjoining the Virgin Islands from proceeding with or reviving the GRM contract. *Id.* The Virgin

16

Islands argued on appeal that the District Court lacked jurisdiction—on mootness grounds—to enjoin the contract between the Virgin Islands and GRM because the Virgin Islands had voluntarily terminated the contract two days before the hearing on the motion. *Id.* This Court determined that the Virgin Islands "failed to meet its heavy burden of demonstrating that there is no reasonable expectation that it would again enter into a contract similar to the one at issue." *Id*. at 285. We reasoned, in part, that:

> The timing of the contract termination—just five days after the United States moved to invalidate it, and just two days before the District Court's hearing on the motion—strongly suggests that the impending litigation was the cause of the termination. Additionally, the Governor's sole justification for the termination of the contract was that "such termination is in the best interest of the Government." But this statement is extremely general, and surely does not provide any assurance that a similar contract would not be entered into again. . . . In short, the mere fact that the Governor has terminated a contract in this one instance with litigation lurking a couple of days away gives no assurance that a similar contract will not be entered into in the future.

> Additionally, the [Virgin Islands'] continued defense of the validity and soundness of the contract prevents the mootness argument from carrying much weight. . . . This stance does not bespeak of a genuine belief that the contract was of a type that would not be contemplated again.

17

*Id.* at 285–86. Like the timing of the contract termination and the Virgin Islands' continued defense of its contract, here Temple's timing of the policy change, as well as its continued defense of its former policy, do not meet the "formidable" burden of demonstrating that there is no reasonable expectation that it would reimplement its former policy. *See id.* at 285.

Temple urges us to consider the Eleventh Circuit opinion in *Jews for Jesus, Inc. v. Hillsborough County Aviation Authority*, 162 F.3d 627 (11th Cir. 1998), as support for its position that this issue is moot. In *Jews for Jesus*, the plaintiff brought a lawsuit in August 1995 against Tampa International Airport seeking injunctive and declaratory relief that would permit the organization to distribute literature at the airport.[5] 162 F.3d at 629. Approximately one month after the commencement of the lawsuit, in September 1995, the airport lifted the prohibition on the distribution of literature. *Id.* After that time, individuals and organizations—including Jews for Jesus—were freely permitted to distribute literature at the Tampa International Airport. *Id.* Jews for Jesus argued, however, that there was still a justiciable "case or controversy" before the district court because of the possibility of a return to the prior prohibition (or to the restrictive policy in place before the prohibition). *Id.* The Eleventh Circuit disagreed. It found that there was no reasonable expectation that Tampa International Airport would return to its prior policy. *Id.* This determination was based on the Court's assessment that the new

---

[5] The airport had a policy for literature distribution that was suspended in November 1986; it had therefore been "under review" for nine years at the time of Jews for Jesus' lawsuit. *Jews for Jesus*, 162 F.3d at 629 n.2.

"open door" policy appeared to have been the result of substantial deliberation on the part of airport officials. *Id.* In addition, the Court noted that evidence suggested that the Airport consistently applied the new policy for three years (the policy was changed in September 1995 and the Court issued its opinion in December 1998). *Id.* Of course we are not bound by Eleventh Circuit precedent; regardless, we do not believe that our conclusion is at odds with that of the Eleventh Circuit. In contrast to *Jews for Jesus*, where the airport lifted its prohibition one month after the lawsuit began, Temple did not change its policy until the discovery process was almost over, more than a year after the commencement of litigation, and less than three weeks remained before the dispositive motion deadline in the case. Further, the record before us does not support an assessment that Temple's policy change was the result of substantial deliberation, such that Temple would not be inclined to revert back to its old policy. To the contrary, Temple continues to defend that former policy.

Thus, DeJohn's claims for equitable relief did not become moot with Temple's voluntary revision of its policy.

We now consider Temple's argument that DeJohn is no longer a student at the University, and that his claim for injunctive relief is moot for that reason. Temple would have us resolve this issue based on whether DeJohn is currently a student. The circumstances of this case reveal, however, that whether DeJohn qualifies as a "student"—one who attends a school or one who studies[6]—is not necessarily easy to discern.

---

[6] Merriam-Webster's Collegiate Dictionary defines "student" as "one who attends a school" or "one who studies: an attentive

19

On the record before us, we are satisfied that DeJohn has a legally cognizable interest in the outcome of this case.

There is no dispute between the parties that in the master's degree program at Temple University all course work and other requirements must be completed within three years from the date of admission unless a student successfully secures a leave of absence.[7]  DeJohn enrolled in January 2002 and completed all of the required course work for his master's thesis by the end of the fall 2003 semester.  DeJohn submitted the first completed draft of his thesis to Dr. Lockenour, his thesis advisor, in March 2005.  In March 2006, DeJohn provided his most recent thesis draft to Dr. Andrew Isenberg, the Chair of the History Department.   DeJohn's thesis has not since been approved; the record reflects that the last action taken with respect to it was when Dr. Isenberg forwarded the draft to Dr. Lockenour for his review as DeJohn's primary thesis reader.

Temple argues that the reason DeJohn is not registered as a student, and why he cannot be a student at Temple, is because the time period for his matriculation, three years enrolled and

---

and systematic observer."  MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 1239 (11th ed. 2003).

[7] The record indicates that DeJohn was granted a military leave of absence for about a year (or two semesters).  He was deployed to Bosnia after the spring 2002 semester (his first semester) and it appears that he missed the fall 2002 semester and the spring 2003 semester and did not return to class until the fall of 2003.  *See* Reply Brief of Defendant-Appellant at 3, DeJohn v. Temple University, No. 07-2220 (3d Cir. September 13, 2007).

one year on military leave, expired in December 2006[8] before DeJohn fulfilled the requirements of the master's program.[9] Reply Brief of Defendant-Appellant at 3, DeJohn v. Temple University, No. 06-0778 (3d Cir. September 13, 2007). DeJohn states that the reason he is not currently registered for classes is because he already completed all of the required course work for his master's degree, and is awaiting approval of his thesis. DeJohn points out that absent from the record is any fact indicating that he graduated or that he has been dismissed from the school. We agree that, on this record, DeJohn continues to have a relationship with Temple University, and as such, continues to be subject to the sexual harassment policy. DeJohn completed all of the required course work for his master's program and submitted a complete draft of his master's thesis by March of 2005, that is, within the allowable time period for matriculation. From our perspective, DeJohn will continue to be a "student," interacting with students, professors, and

---

[8] We think Temple may have intended to say that DeJohn's time period for matriculation expired in January 2006, as that would be four years after he was admitted to the program in January 2002.

[9] We observe that Temple admitted in its Answer that DeJohn was a Temple University graduate student and that it made no curative amendment to this pleading. *Compare* Verified Complaint ¶ 7, DeJohn v. Temple University, No. 06-778 (E.D.Pa. Feb. 22, 2006) ("Plaintiff Christian DeJohn . . . is an adult graduate student pursuing a master's degree in military and American history at the University."), *with* Defendants' Answer to Plaintiff's Complaint with Affirmative Defenses ¶ 7, DeJohn v. Temple University, No. 06-778 (E.D.Pa. Sept. 21, 2006) ("Admitted.").

21

administration, until his graduate degree is either granted or denied. Temple itself averred that there is no required standard time frame in which university officials must review and render a final decision on his graduate thesis—that "[t]he time frame to review and grant final approval of a graduate degree thesis is solely dependent upon the quality of work that the graduate submits for review." Answer at 19, DeJohn v. Temple University, No. 06-00778 (E.D.Pa. Sept. 21, 2006). Until DeJohn's thesis has received final approval or disapproval, it seems clear that he remains a member of the Temple University community,[10] subject to its Policy on Sexual Harassment. As such, DeJohn's claims for equitable relief are not moot.

IV.

Our appellate review properly extends to matters inextricably bound up with the injunction decision. WRIGHT & MILLER, FEDERAL PRACTICE AND PROCEDURE § 3921.1. While the scope of appellate review under § 1292(a)(1) is confined to the issues necessary to determine the propriety of the interlocutory order itself, interlocutory orders with respect to permanent injunctions provide frequent occasion for review of the merits. *Id.* Here, in order for us to determine the propriety of the injunction, we must review the District Court's determination that Temple University's Policy on Sexual Harassment is facially unconstitutional.

---

[10] The Temple University Policy on Sexual Harassment applies to "all individuals who are part of the Temple Community" "in any context." Temple University Policies and Procedures Manual, Policy on Sexual Harassment, Section II.A.1.

22

A.

We begin our analysis by noting that the overbreadth doctrine may be appropriately utilized in the school setting.[11] *See Rust v. Sullivan*, 500 U.S. 173, 200 (1991) (referencing *Keyishian v. Bd. of Regents, State Univ. of N.Y.*, 385 U.S. 589, 603, 605–06 (1967) ("[W]e have recognized that the university is a traditional sphere of free expression so fundamental to the functioning of our society that the Government's ability to control speech within that sphere by means of conditions attached to the expenditure of Government funds is restricted by the vagueness and overbreadth doctrines of the First Amendment."). We think this is an important initial observation as the Supreme Court's resolution of student free speech cases has been, to this point in time, without reference to the

---

[11] Derived from the First Amendment, the overbreadth doctrine is typically employed to strike down criminal statutes that are unconstitutionally overbroad on their face. Overbreadth attacks "have been entertained in cases involving statutes which, by their terms, seek to regulate 'only spoken words.'" *Broadrick v. Oklahoma*, 413 U.S. 601, 612–13 (1973) (citations omitted). "Overbreadth attacks have also been allowed where the Court thought rights of association were ensnared in statutes which, by their broad sweep, might result in burdening innocent associations." *Id.* (citations omitted). Further, these challenges have been entertained "where statutes, by their terms, purport to regulate the time, place, and manner of expressive or communicative conduct . . . and where such conduct has required official approval under laws that delegated standardless discretionary power to local functionaries, resulting in virtually unreviewable prior restraints on First Amendment rights." *Id.* (citations omitted).

overbreadth doctrine. *See Tinker v. Des Moines Ind. Cmty Sch. Dist.*, 393 U.S. 503 (1969) (implicating a school policy); *Papish v. Bd. of Curators of Univ. of Missouri*, 410 U.S. 667 (1973) (same); *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675 (1986) (same). Even so, since the inception of overbreadth jurisprudence, the Supreme Court has recognized its prominent role in preventing a "chilling effect" on protected expression. *Broadrick v. Oklahoma*, 413 U.S. 601, 630 (1973) ("Although the Court declines to hold the Oklahoma Act unconstitutional on its face, it does expressly recognize that overbreadth review is a necessary means of preventing a 'chilling effect' on protected expression."). This laudable goal is no less implicated on public university campuses throughout this country, where free speech is of critical importance because it is the lifeblood of academic freedom. As the Supreme Court in *Healy v. James* explained, "the precedents of this Court leave no room for the view that, because of the acknowledged need for order, First Amendment protections should apply with less force on college campuses than in the community at large. Quite to the contrary, 'the vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools.'" 408 U.S. 169, 180 (1972) (citation omitted). *See also Widmar v. Vincent*, 454 U.S. 263, 268–69 (1981) ("With respect to persons entitled to be there, our cases leave no doubt that the First Amendment rights of speech and association extend to the campuses of state universities."). In the context of school anti-discrimination policies, our Court has emphasized that

> "Harassing" or discriminatory speech, although evil and offensive, may be used to communicate ideas or emotions that nevertheless implicate First Amendment protections. As the Supreme Court has emphatically declared, "[i]f there is a bedrock

24

principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea offensive or disagreeable."

*Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200, 209 (3d Cir. 2001) (quoting *Texas v. Johnson*, 491 U.S. 397, 414 (1989)). Because overbroad harassment policies can suppress or even chill core protected speech, and are susceptible to selective application amounting to content-based or viewpoint discrimination, the overbreadth doctrine may be invoked in student free speech cases.

B.

In reviewing a facial challenge to a racial harassment policy, we have explained:

A regulation of speech[12] may be struck down on its face if its prohibitions are sufficiently overbroad—that is, if it reaches too much expression that is protected by the Constitution. The harassment policy can be found unconstitutionally overbroad if "there is a 'likelihood that the statute's very existence will inhibit free expression'" to a substantial extent.

In most cases, courts will not assess the

_____

[12] "While the harassment policy may be said to regulate conduct, it clearly regulates speech, insofar as it specifically targets certain expression." *Sypniewski v. Warren Hills Reg'l Bd. of Educ.*, 307 F.3d 243, 258 n.14 (3d Cir. 2002).

25

constitutionality of a provision apart from its particular applications. But cases involving freedom of speech are frequently excepted from this general rule.

. . .

Accordingly, most cases alleging unconstitutional enforcement of a public school's disciplinary policies, like other laws, "are best addressed when (and if) they arise, rather than prophylactically through the disfavored mechanism of a facial challenge." For these reasons, courts will not strike down a regulation as overbroad unless the overbreadth is "substantial in relation to the [regulation's] plainly legitimate sweep."

Furthermore, in response to an overbreadth challenge, a policy can be struck down only if no reasonable limiting construction is available that would render the policy constitutional. "[E]very reasonable construction must be resorted to, in order to save a statute from unconstitutionality." A court, however, "will not rewrite a . . . law to conform it to constitutional requirements." Accordingly, we must determine whether the relatively broad language of the policy can reasonably be viewed narrowly enough to avoid any overbreadth problem.

*Sypniewski v. Warren Hills Reg'l Bd. of Educ.*, 307 F.3d 243, 258–59 (3d Cir. 2002) (internal citations omitted). In addition

to the general considerations inherent in reviewing facial challenges to speech regulations, in the present facial challenge we are guided by our decision in *Saxe*.[13]

---

[13] In *Saxe*, the State College Area School District ("SCASD") adopted an Anti-Harassment Policy. 240 F.3d at 202. Two of the paragraphs of the policy at issue were:

> Harassment means verbal or physical conduct based on one's actual or perceived race, religion, color, national origin, gender, sexual orientation, disability, or other personal characteristics, *and which has the purpose or effect of substantially interfering with a student's educational performance or creating an intimidating, hostile or offensive environment.*
>
> Harassment can include any unwelcome verbal, written or physical conduct which offends, denigrates or belittles an individual because of any of the characteristics described above. Such conduct includes, but is not limited to, unsolicited derogatory remarks, jokes, demeaning comments or behaviors, slurs, mimicking, name calling, graffiti, innuendo, gestures, physical contact, stalking, threatening, bullying, extorting or the display or circulation of written material or pictures.

*Id.* at 202–03, 218–23 (emphasis added). After the Anti-Harassment Policy was adopted, Saxe filed suit in federal court alleging that the Policy was facially unconstitutional under the First Amendment's Free Speech Clause. *Id.* at 203. The District Court found that Saxe had standing to mount a facial challenge but granted SCASD's motion to dismiss, holding that

27

*Saxe*, however, involved a public elementary and high school district. Before we employ the overbreadth analysis as used in *Saxe*, we must point out that there is a difference between the extent that a school may regulate student speech in a public university setting as opposed to that of a public elementary or high school.

It is well recognized that "[t]he college classroom with its surrounding environs is peculiarly the 'marketplace of ideas[,]'" *Healy*, 408 U.S. at 180, and "[t]he First Amendment guarantees wide freedom in matters of adult public discourse[,]" *Fraser*, 478 U.S. at 682. Discussion by adult students in a college classroom should not be restricted. Certain speech, however, which *cannot* be prohibited to adults *may* be prohibited to public elementary and high school students. *See Fraser*, 478 U.S. at 682 ("It does not follow, however, that simply because the use of an offensive form of expression may not be prohibited to adults making what the speaker considers a political point, the same latitude must be permitted to children in a public school."). This is particularly true when considering that public elementary and high school administrators have the unique responsibility to act *in loco parentis*. *See id.* at 684.

In *Sypniewski*, we noted the difference in regulating student speech in public elementary and high schools as compared to public universities. 307 F.3d at 260. There, we stressed that, in the context of a public elementary or high school, the "special needs of school discipline" are an important consideration in regulating speech. *Id.* (explaining that "a

the policy was facially constitutional. *Id.* at 204. We reversed. *Id.* at 202, 218.

28

school disciplinary policy will be struck down as overbroad only after consideration of the special needs of school discipline has been brought to bear together with the law's general hesitation to apply this 'strong medicine'"). However, and most important here, we explicitly recognized that, although "[s]peech codes are disfavored under the First Amendment because of their tendency to silence or interfere with protected speech . . . [,] *public secondary and elementary school administrators are granted more leeway* [to restrict speech] *than public colleges and universities . . . ."* *Id.* (emphasis added). Accordingly, in determining whether Temple University's policy passes constitutional muster under our reasoning in *Saxe*, we keep in mind that Temple's administrators are granted *less leeway* in regulating student speech than are public elementary or high school administrators.

In *Saxe*, we noted that there is no "harassment exception" to the First Amendment's Free Speech Clause; that is, "we have found no categorical rule that divests 'harassing' speech as defined by federal anti-discrimination statutes, of First Amendment protection."[14] *Id.* at 204, 210. We explained that

---

[14] We noted that the SCASD Policy prohibited a substantial amount of speech that would not constitute actionable harassment under federal law. Significantly, we noted that the Supreme Court has recognized the right of a public school student to sue a school under Title IX for "hostile environment" harassment. *Saxe*, 240 F.3d at 205–06. This right applies to cases involving harassment of a student by a teacher or other agent of a school, as well as for certain cases of student-on-student harassment. *Id.* at 205 (citing *Davis v. Monroe County Bd. of Educ.*, 526 U.S. 629 (1999); *Franklin v. Gwinnett County Pub. Sch.*, 503 U.S. 60, 74–75 (1992)). To recover in such a

while there is no question that non-expressive, physically harassing *conduct* is entirely outside the ambit of the free speech clause, "[w]hen laws against harassment attempt to regulate oral or written expression on such topics, however detestable the views expressed may be, we cannot turn a blind eye to the First Amendment implications. 'Where pure expression is involved,' anti-discrimination law 'steers into the territory of the First Amendment.'" *Id.* at 206 (quoting *DeAngelis v. El Paso Mun. Police Officers Ass'n*, 51 F.3d 591, 596 (5th Cir. 1995)).

Recognizing, then, that some "harassing" speech may be worthy of First Amendment protection, we look to see whether Temple's Policy on Sexual Harassment reaches too much expression that is constitutionally protected. *See Sypniewski*, 307 F.3d at 258. The relevant portion of Temple's challenged sexual harassment policy reads:

> For all individuals who are part of the Temple community, all forms of sexual harassment are prohibited, including the following: an unwelcome sexual advance, request for sexual favors, *or other expressive, visual or physical conduct of a sexual or gender-motivated nature when . . . (c) such conduct has the purpose or effect of unreasonably interfering with an individual's work, educational performance, or*

---

case, a plaintiff must establish "sexual harassment [] that is so severe, pervasive, and objectively offensive, and that so undermines and detracts from the victims' educational experience, that [he or she is] effectively denied equal access to an institution's resources and opportunities." *Id.* (citation omitted).

*status; or (d) such conduct has the purpose or effect of creating an intimidating, hostile, or offensive environment.*

Temple University Policy on Sexual Harassment, Section II.A.1 (emphasis added). With language mirroring the Policy at issue in *Saxe*, Temple's policy unequivocally prohibits any "expressive, visual or physical conduct" when that conduct "has the purpose or effect of unreasonably interfering with an individual's work, educational performance, or status; or . . . has the purpose or effect of creating an intimidating, hostile, or offensive environment." *Compare Saxe*, 240 F.3d at 210, *with supra* note 13 & Temple University Policy on Sexual Harassment, Section II.A.1.[15]

*Saxe* specifically criticized some of this language, and the criticism is apropos. Initially, the policy's focus upon the motives of the speaker is rightly criticized. Under the Supreme Court's rule in *Tinker*, a school must show that speech will cause actual, material disruption before prohibiting it.[16] *Tinker*,

---

[15] We recognize that Temple's sexual harassment policy is not nearly as broad as the anti-harassment policy in *Saxe*. The policy in *Saxe* prohibited conduct based on any "personal characteristic," which included "clothing, physical appearance . . . hobbies or values, etc." *Saxe*, 240 F.3d at 220. Temple's policy, on the other hand, is limited to conduct "of a sexual or gender-motivated nature."

[16] In *Tinker*, school officials adopted a policy in order to prevent a group of students from wearing black armbands to express their opposition to the United States' participation in the Vietnam War. The Court upheld the students' right to wear the armbands because there was "no evidence whatever of

393 U.S. at 509. Under the language of Temple's Policy, a student who sets out to interfere with another student's work, educational performance, or status, or to create a hostile environment would be subject to sanctions regardless of whether these motives and actions had their intended effect. *See Saxe*, 240 F.3d at 216–17. As such, the focus on motive is contrary to *Tinker*'s requirement that speech cannot be prohibited in the absence of a tenable threat of disruption.[17]

---

petitioners' interference, actual or nascent, with the schools' work or of collision with the rights of other students . . . ." *Tinker*, 393 U.S. at 508. The school argued that its policy was necessary because of a concern that the armbands would possibly create a disturbance in school. The Supreme Court held that "in our system, undifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression." *Id.*

[17] We recognize that "[s]ince *Tinker*, the Supreme Court has carved out a number of narrow categories of speech that a school may restrict even without the threat of substantial disruption." *Saxe*, 240 F.3d at 212 (discussing *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675 (1986); *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260 (1988)). "Under *Fraser*, a school may categorically prohibit lewd, vulgar or profane language. Under *Hazelwood*, a school may regulate school-sponsored speech (that is, speech that a reasonable observer would view as the school's own speech) on the basis of any legitimate pedagogical concern." *Id.* at 214. We then determined that speech falling outside of these categories is subject to *Tinker*'s general rule: it may be regulated only if it would substantially disrupt school operations or interfere with the rights of others. *Id.*

32

Further, the policy's use of "hostile," "offensive," and "gender-motivated" is, on its face, sufficiently broad and subjective that they "could conceivably be applied to cover any speech" of a "gender-motivated" nature "the content of which offends someone." *See Saxe*, 240 F.3d at 217. This could include "core" political and religious speech, such as gender politics and sexual morality.[18] *See id.* Absent any requirement akin to a showing of severity or pervasiveness—that is, a requirement that the conduct objectively and subjectively creates a hostile environment or substantially interferes with an individual's work—the policy provides no shelter for core protected speech. *See Saxe*, 240 F.3d at 210–11 (referencing *Davis Next Friend LaShonda D. v. Monroe County Bd. of Educ.*, 526 U.S. 629, 652 (1999) ("[I]n the context of student-on-student harassment, damages are available only where the behavior is so severe, pervasive, and objectively offensive that it denies its victims the equal access to education that Title IX is designed to protect.")).

## C.

Before declaring whether this or any policy is unconstitutional, we must determine whether it is susceptible to a reasonable limiting construction. *Saxe*, 240 F.3d at 215 (citing *Stretton v. Disciplinary Bd. of the Supreme Court of*

---

[18] Indeed, in the instant case, the Plaintiff, a graduate student pursuing a master's degree in Military and American History, argues that he felt inhibited in expressing his opinions in class concerning women in combat and women in the military. Brief of Plaintiff-Appellee at 7, DeJohn v. Temple University, No. 07-2220 (3d Cir. August 27, 2007).

*Pennsylvania*, 944 F.2d 137, 144 (3d Cir. 1991) (citations omitted); *Hoffman Estates v. Flipside, Hoffman Estates*, 455 U.S. 489, 494 n.4 (1982) ("In evaluating a facial challenge to a state law, a federal court must, of course, consider any limiting construction."); *Broadrick*, 413 U.S. at 617 n.16 ("a federal court must determine what a state statute means before it can judge its facial unconstitutionality")). Under the Temple Policy the following elements, if present, constitute sexual harassment: (1) expressive, visual or physical conduct (2) of a sexual or gender-motivated nature and which (3) has the purpose or effect of either (3a) unreasonably interfering with an individual's work, educational performance, or status, or (3b) creating an intimidating, hostile, or offensive environment. If we juxtapose this definition of harassment with the limiting construction that this Court placed on the policy at issue in *Saxe*, we find that they are very similar.[19] Importantly, even with the limiting construction, our Court found that the *Saxe* policy still prohibited "a substantial amount of non-vulgar, non-sponsored student speech" and that it still did not satisfy *Tinker*. *Saxe*, 240 F.3d at 216–17. Even more significantly, this case deals with a

---

[19] The *Saxe* policy, narrowed,

> would require the following elements before speech could be deemed harassing: (1) verbal or physical conduct (2) that is based on one's actual or perceived personal characteristics and (3) that has the purpose or effect of either (3a) substantially interfering with a student's educational performance or (3b) creating an intimidating, hostile, or offensive environment.

240 F.3d at 216.

harassment policy in the university setting, whereas the policy in *Saxe* applied to high-schoolers. Thus, the limitations *Tinker* imposed on a school's ability to promulgate such a policy must *at least* be satisfied. As we indicated before, we must proceed with greater caution before imposing speech restrictions on adult students at a college campus.

First, harassment is defined in the policy as including expressive conduct of a "gender-motivated nature." This phrase gives rise to a number of issues. "Gender-motivated" necessarily requires an inquiry into the motivation of the speaker. Whose gender must serve as the motivation, the speaker's or the listener's? And does it matter? Additionally, we must be aware that "gender," to some people, is a fluid concept.[20] Even if we narrow the term "gender-motivated" to

---

[20] The term "gender" has recently acquired a meaning distinct from "sex." Traditionally, "gender" has been used primarily to refer to "masculine," "feminine," and "neuter." "Gender has long been used as a grammatical distinction of a word according to the sex referred to." Bryan A. Garner, A Dictionary of Modern Legal Usage 382 (2d ed. 1995). The concept of gender is also rooted in science and means sex—male or female—based on biology (chromosomes, genitalia). *See* 1 OXFORD ENGLISH DICTIONARY 1081 (5th ed. 2002). However, the usage of the word is changing in some circles as a result of social and ideological movements that find the scientific meaning to be unsatisfactory or not sufficiently inclusive. The Oxford English Dictionary reflects this change by including another definition of "gender," which is "[s]ex as expressed by social or cultural distinctions." *Id.* For example, California now defines "gender" to "include[] a person's gender identity and gender related appearance and behavior whether or

35

"because of one's sex," we are far from certain that this limitation still does not encompasses expression on a broad range of social issues.

Second, as in *Saxe*, Temple's Policy reaches any speech that interferes or is intended to interfere with educational performance or that creates or is intended to create a hostile environment. *See Saxe*, 240 F.3d at 216. Thus, "the Policy punishes not only speech that actually causes disruption, but also speech that merely intends to do so: by its terms, it covers speech 'which has the purpose or effect of' interfering with educational performance or creating a hostile environment. This ignores *Tinker*'s requirement that a school must reasonably believe that speech will cause actual, material disruption before prohibiting it." *Id.* at 216–17.[21] Additionally, the Policy

_____

not stereotypically associated with the person's assigned sex at birth." *See* CAL GOV'T CODE §§ 12926(p), 12949. Gender has also been defined to include pregnancy, childbirth, and related medical conditions. *See, e.g.*, S.C. CODE ANN. § 1-13-30(l); CAL GOV'T CODE §§ 12926(p). In 2002, New York amended its Human Rights Law, defining "gender" to include discrimination on the basis of "a person's gender identity self-image, appearance, behavior or expression, whether or not that gender identity, self-image, appearance, behavior or expression is different from that traditionally associated with the legal sex assigned to that person at birth." N.Y.C. CODE § 8-102.

[21] Temple notes that its former sexual harassment policy's language is almost identical to language provided by the EEOC and thus, in this context, Temple's use of the terms "purpose" or "effect" has a specific meaning and should not be automatically analogized to their use in *Saxe*. However, Temple fails to explain how that makes the "specific meaning" constitutionally

prohibits a substantial amount of non-vulgar, non-sponsored student speech. *Id.*

Even if we ignore the "purpose" component, the Policy's prong that deals with conduct that "unreasonably interfere[s] with an individual's work" probably falls short of satisfying the *Tinker* standard. If we were to construe "unreasonable" as encompassing a subjective and objective component, it still does not necessarily follow that speech which effects an unreasonable interference with an individual's work justifies restricting another's First Amendment freedoms. Under *Tinker*, students may express their opinions, even on controversial subjects, so long as they do so "without colliding with the rights of others." *Tinker*, 393 U.S. at 512. As we observed in *Saxe*, while the precise scope of this language is unclear, *Saxe*, 240 F.3d at 217, we do believe that a school has a compelling interest in preventing harassment. Yet, unless harassment is qualified with a standard akin to a severe or pervasive requirement, a

---

permissible. Temple does state that "[t]here is an abundance of federal court decisions recognizing the reasonableness of this definition of harassment." However, Temple only cites one case in support—*Stroehmann Bakeries, Inc. v. Local 776, Intern. Broth. of Teamsters*, 969 F.2d 1436 (3d Cir. 1992). *Stroehmann Bakeries* does not pass on whether the EEOC language is or is not constitutional, but instead cites the EEOC policy *generally* for the proposition that "[t]here is a well-defined and dominant public policy concerning sexual harassment in the workplace which can be ascertained by reference to law and legal precedent." *Id.* at 1141–42.

harassment policy may suppress core protected speech.[22] *See id.*

For similar reasons, some speech that creates a "hostile or offensive environment" may be protected speech under the First Amendment. It is difficult to cabin this phrase, which could encompass any speech that might simply be offensive to a listener, or a group of listeners, believing that they are being subjected to or surrounded by hostility. *See id.* Certainly speech amounting to "fighting words" would not be protected, *Chaplinsky v. New Hampshire*, 315 U.S. 568, 572–73 (1942), but the policy covers much more speech than could be prohibited under *Tinker*'s substantial disruption test as well as speech that does not rise to the level of "fighting words."

V.

Because our review of the District Court's grant of injunctive relief required us to evaluate the constitutionality of Temple's Policy on Sexual Harassment, and because we now conclude that the Policy is facially overbroad, we will affirm the District Court's March 21 Order granting injunctive relief in favor of DeJohn.

---

[22] We note that in *Saxe* we held that the policy "which prohibits speech that would 'substantially interfer[e] with a student's educational performance,' may satisfy the *Tinker* standard. The primary function of a public school is to educate its students; conduct that substantially interferes with the mission is, almost by definition, disruptive to the school environment." *Saxe*, 240 F.3d at 217.